Argued and submitted November 26, 2019, affirmed May 12, petition for review allowed September 30, 2021 (368 Or 597)
See later issue Oregon Reports

In the Matter of
the Suspension of the Driving Privileges of
Michael Thomas MURDOCH,
*Petitioner-Respondent,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES DIVISION (DMV),
a Division of the Department of Transportation,
*Respondent-Appellant.*

Columbia County Circuit Court
17CV49033; A169189

492 P3d 89

Department of Motor Vehicles (DMV) appeals a circuit court judgment reversing an administrative law judge's affirmation of DMV's decision to suspend petitioner's driving privileges for refusing to submit to a chemical breath test. DMV argues that the circuit court erred, contending (1) that ORS 813.130 merely requires that a driver be informed of his rights and the consequences of refusal prior to the actual performance of the test, not necessarily prior to the request, and (2) that the trooper's threat of obtaining a search warrant as a consequence of petitioner's refusal did not invalidate adherence to the rights and consequences procedure for purposes of the statute. *Held*: The circuit court did not err. Regarding the first argument, the plain text of ORS 813.100(1) indicates that an officer need not inform a driver of his rights and consequences before asking him to submit to the test. As for the second argument, the trooper's modification of the "rights and consequences" as described on the Implied Consent Combined Report form was a legally unauthorized administrative procedure and, as such, the administrative sanction levied based on those invalid procedures was itself invalid. Accordingly, the administrative law judge's order affirming the imposed license suspension was appropriately reversed by the circuit court.

Affirmed.

Cathleen B. Callahan, Judge.

Colm Moore, Assistant Attorney General, argued the cause for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

John Henry Hingson III argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and James, Judge, and Landau, Senior Judge.

JAMES, J.

Affirmed.

**JAMES, J.**

Before the Oregon Department of Transportation, Driver and Motor Vehicles Services Branch (DMV) can administratively suspend a person's driving privileges for a refusal to submit to a breath test, that person must be informed of the rights and consequences of refusal, pursuant to ORS 813.100. In this case, a state trooper requested that petitioner take a chemical breath test, and petitioner refused. After that initial request and refusal, the trooper asked, "Are you going to take the breathalyzer?" The trooper then stated: "No? Okay. I'm going to read to you and I will go straight on to write a search warrant then. That's what we do in this county. We write search warrants if you are going to refuse." The trooper then read petitioner the rights and consequences described in ORS 813.130 from the back of the Implied Consent Combined Report (ICCR). Petitioner again refused. As a result, DMV sought to suspend his license.

Petitioner requested a hearing regarding the suspension, wherein he challenged the suspension on two alternative grounds: (1) that the trooper was required to inform petitioner of the rights and consequences prior to, not after, his initial request to submit to the breathalyzer, or alternatively that (2) the trooper's inclusion of language about obtaining a warrant, which does not appear in the DMV-approved ICCR, modified the administrative scheme, and therefore failed to comply with the requirements of ORS 813.130.

An administrative law judge (ALJ) affirmed the suspension, focusing solely on the second argument concerning the effect, if any, of the trooper's threat to obtain a warrant. The circuit court reversed, focusing solely on the first argument concerning the timing of the giving of the rights and consequences. DMV appeals, arguing that the circuit court erred, and that the statute merely requires that the driver be informed prior to the actual performance of the test, not the request. On that point, as we explain, we agree with DMV. As to the argument taken up by the ALJ, DMV argues that the trooper's inclusion of a warrant threat did not invalidate his adherence to the rights and consequences procedure for purposes of ORS 813.130. We disagree. We

conclude that the ALJ's order lacked substantial evidence, and the administratively imposed license suspension must be reversed for that reason. Accordingly, we affirm the circuit court's judgment.

Although this appeal is from the circuit court, we review the ALJ's final order directly for substantial evidence and errors of law. ORS 813.450(4); *Davis v. DMV*, 209 Or App 39, 41, 146 P3d 378 (2006), *rev den*, 342 Or 344 (2007). We state the facts consistently with the ALJ's factual findings, which are not contested by the parties.

A witness initially reported petitioner's vehicle traveling at erratic speeds and failing to maintain his driving lane. After receiving that report, a state trooper saw petitioner's vehicle, which matched the witness' description, drifting across traffic lanes. The trooper initiated a traffic stop based on the observed traffic violations and for suspicion of driving under the influence of intoxicants (DUII). Once stopped, the trooper began to explain to the driver the reason for the stop, but the driver, who was later identified as petitioner, interjected, telling the trooper, "I'm hammered," as he handed his keys to the trooper. Petitioner also told the trooper that he drank three whiskeys that night, in addition to other things. The trooper observed that petitioner had bloodshot, watery eyes, with dilated pupils. She also detected a strong odor of alcoholic beverage coming from petitioner's breath and observed that petitioner's speech was slurred. The trooper concluded that, more likely than not, petitioner had committed the offense of DUII.

Although petitioner initially agreed to perform standardized field sobriety tests (SFSTs), when the trooper asked petitioner to stand in the instructional position, petitioner said, "I'm going to waive those," which the trooper understood to mean that petitioner refused to perform the SFSTs. The trooper then read to petitioner, from a prepared card, the *Rohrs* admonishment, which described the consequences of refusing to take the SFSTs, before asking petitioner a second time whether he would perform the SFSTs. Petitioner refused a second time. The trooper then arrested petitioner for DUII and transported him to the Columbia County Jail.

At the jail, the trooper read the *Miranda* warnings to petitioner, and petitioner subsequently indicated that he understood. The trooper then asked petitioner "Are you going to take the breathalyzer?" Without waiting for a reply, the trooper continued, "No? Okay. I'm going to read [the rights and consequences from the ICCR] to you, and I will go straight on to write a search warrant then. That's what we do in this county. We write search warrants if you are going to refuse."

The trooper then informed petitioner of his rights and consequences as described in ORS 813.130, by reading from the ICCR. The trooper then requested, for a second time, that petitioner submit to a chemical breath test. Petitioner responded, "No." Following the refusal, the trooper provided petitioner with notice of the suspension of his driver's license and the opportunity for a hearing before an ALJ to contest the validity of the suspension. Upon receipt of the ICCR stating that petitioner had refused to take the breath test, DMV proposed to suspend petitioner's driving privileges for one year.

We begin with the argument that formed the basis of the circuit court's reversal: the timing of the advice of rights and consequences. As required under Oregon's implied consent statute,

> "[a] [chemical breath] test shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance. Before the test is administered the person requested to take the test shall be informed of consequences and rights as described under ORS 813.130."

ORS 813.100(1).

In accordance with that statute, we have previously highlighted the importance of timing in providing the rights and consequences to a person before the test is administered. *See State v. Sanchez-Cacatzun*, 304 Or App 650, 652, 468 P3d 964 (2020), *rev den*, 367 Or 559 (2021) ("Before the breath test is administered, the person shall be informed of [the] [rights and consequences] as described

under ORS 813.130." (Brackets in original; internal quotation marks omitted.)). Notably, however, the statute, and our repertoire of case law, are both silent regarding any interpretation regarding what exactly the "administration" of that test encompasses. Accordingly, the resolution of the issue at hand in this case—whether an officer must provide rights and consequences to the driver before *asking* him to submit to a chemical breath test—turns on what the legislature intended when it described the "administration" of the chemical test.

As with all matters of statutory construction, our "paramount goal" is to determine the legislature's intent. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). In determining the legislature's intent, we give "primary weight" to the statute's text and context. *Id.* Thus, because "there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes[,]" we begin with the plain meaning of the text of the statute. *Id.* (internal quotation marks omitted).

The term "administered" is not itself defined in Oregon's DUII statutory scheme. "When the legislature does not provide a definition of a statutory term, we ordinarily look to the plain meaning of the statute's text to determine what particular terms mean." *State v. Dickerson*, 356 Or 822, 829, 345 P3d 447 (2015); *see also PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) ("[W]ords of common usage typically should be given their plain, natural, and ordinary meaning.").

In searching for the plain and ordinary meaning of an undefined statutory term we consider dictionary definitions to aid in our understanding. *Central Oregon LandWatch v. Deschutes County*, 276 Or App 282, 289-90, 367 P3d 560 (2016). The verb "administered," as it is used here, is defined as "to direct or superintend the execution, use, conduct of," "to mete out : dispense," "to give ritually" or to "tender," as exemplified in the following phrases: "vocational interest tests are *administered* to all students," the priest "*administer*[ed] the last rites of the church," "the formal oath of office was *administered* to him," or "the following

questions were first *administered* by the Archbishop of Canterbury." *Administered*, Unabridged.Merriam-Webster.com (last updated Dec 2019) (emphases in original).

In construing statutes, however, we do not simply "consult dictionaries and interpret words in a vacuum." *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011). Dictionaries, after all, do not tell us what words mean, only what words can mean, "depending on their context and the particular manner in which they are used." *Id.*; *see also State v. Gonzalez-Valenzuela*, 358 Or 451, 463, 365 P3d 116 (2015) ("[A] dictionary definition—although providing some evidence of meaning—should not be relied on to resolve a dispute about plain meaning without critically examining how the definition fits into the context of the statute itself."). Rather, context determines which of multiple definitions is the one the legislature intended, thus, "We look to the context in which the word appears to determine which meaning the legislature intended." *Larsen v. Board of Parole*, 231 Or App 59, 64, 219 P3d 28 (2009), *rev den*, 348 Or 13 (2010); *see also State v. Stewart*, 282 Or App 845, 851, 386 P3d 688, *rev'd on other grounds*, 362 Or 638, 413 P3d 959 (2016); *see also Gonzalez-Valenzuela*, 358 Or at 461 (relevant dictionary definition is the one that makes sense in the context of the statute).

Contextually, we note that ORS 813.100(2) provides:

"If a person refuses to submit to a test under this section or if a breath test under this section discloses that the person, at the time of the test, had a level of alcohol in the person's blood that constitutes being under the influence of intoxicating liquor under ORS 813.300 [(Use of blood alcohol percentage as evidence)] and the person has been informed of rights and consequences as provided under ORS 813.130 [(Rights of and consequences for person asked to take test)], the person's driving privileges are subject to suspension under ORS 813.410."

Additionally, ORS 813.150 provides:

"In addition to a chemical test of the breath, blood or urine administered under ORS 813.100 [(Implied consent to breath or blood test)] or 813.140 [(Chemical test with consent)], upon the request of a police officer, a person shall

be permitted upon request, at the person's own expense, reasonable opportunity to have any licensed physician and surgeon, licensed professional nurse or qualified technician, chemist or other qualified person of the person's own choosing administer a chemical test or tests of the person's breath or blood for the purpose of determining the alcoholic content of the person's blood or a chemical test or tests of the person's blood or urine, or both, for the purpose of determining the presence of cannabis, a controlled substance or an inhalant in the person."

The statutory scheme implicates three distinct concepts: request, administration, and submission. Although it is not an absolute truism, generally, the legislature's use of different terms usually is taken to connote different meanings. *State v. Lane*, 357 Or 619, 629, 355 P3d 914 (2015); *State v. Connally*, 339 Or 583, 591, 125 P3d 1254 (2005) (so stating).

Here, DMV asserts that the plain text of ORS 813.100(1) indicates that an officer need not inform a driver of his rights and consequences before asking him to submit to the test. We agree. The plain text of ORS 813.100 provides that "[a] [chemical breath] test *shall be administered upon the request* of a police officer[,] *** [and] [b]efore the test is administered the person requested to take the test shall be informed ***." (Emphasis added.) Under that statutory scheme, the "administration" of the test is distinct from the request to submit to the test. We construe "administration" as the giving of the test. The statute requires the advice prior to the administration—*i.e.*, the giving of the test—not the request.

We turn now to the second argument in this case—the one discussed by the ALJ—the effect of the trooper's threat to get a warrant. In *Hays v. DMV* (*Hays I*), we considered a challenge to a DMV suspension of the petitioner's driving privileges for failing a breath test. 228 Or App 689, 691, 209 P3d 405, *modified on recons*, 230 Or App 559, 216 P3d 902 (2009). On appeal, the petitioner argued that the trooper who informed him of the consequences of refusing to take a breath test exceeded his authority by adding a consequence omitted by the statutes. In particular, after the petitioner refused to take a breath, blood, or urine test,

the arresting trooper told the petitioner that he would get a warrant for petitioner's blood and urine. *Id.* Petitioner then agreed to take a breath test, which he failed.

On appeal, this court concluded that the officer "could not, in fact, have obtained a warrant allowing him to perform a urine test" because such requests are not authorized unless the officer has specific training to recognize drug impaired drivers and has reasonable suspicion that the arrested driver was impaired by something other than alcohol. *Id.* at 695-96. Because the officer's threat involved something that was not "legally possible," we concluded that the "supplemental inducement" violated the implied consent laws. *Id.* at 698-99. We remanded to the ALJ for the ALJ to determine as a factual matter whether the officer's threat caused the petitioner's "recantation." *Id.* at 699.

On appeal in this case, DMV argues that *Hays I* only prohibits modifications to the rights and consequences that are themselves unlawful. According to DMV, "*Hays I* stands for the proposition that, if an officer induces a person to take a breath test by threatening to do something that was not legally possible, a suspension that results from the failure of that breath test may be invalid." That narrow reading of *Hays I*, however, does not square with our reconsideration of that case in *Hays v. DMV*, 230 Or App 559, 216 P3d 902 (2009) (*Hays II*).

Upon reconsideration in *Hays II*, we clarified our holding, concluding that,

> "[f]irst, ORS 813.410(5)(e) provides that a license suspension 'is valid' if—among other things—the driver failed a breath test after being 'informed under ORS 813.100 of rights and consequences as described under ORS 813.130.' Although that statement ('if the driver is informed according to the statute, the breath test failure requires suspension') does not necessarily, as a matter of pure logic, imply its converse ('if the driver is *not* informed according to the statute, the failure does *not* lead to suspension'), the latter statement is strongly implied nonetheless. Second, in *Moore v. Motor Vehicles Division*, 293 Or 715, 724, 652 P2d 794 (1982), the Supreme Court (in *dictum*) stated, 'An administratively

imposed penalty based on [a legally unauthorized] procedure would be invalid.'"

*Hays II*, 230 Or App at 562-63 (emphasis and brackets in original). Accordingly, and as *Hays II* clarified, *Hays I* did not turn on the lawfulness, or unlawfulness, of the officer's indication he would get a warrant. Rather, the operative inquiry is whether his statement about a warrant—lawful or not—was part of the authorized administrative procedure.

ORS 813.130 provides that "[t]he information about rights and consequences shall be substantially in the form prepared by the Department of Transportation," and further sets forth in subsections (2) and (3) of the statute what that information "shall be substantially." The department "may establish any form it determines appropriate and convenient," ORS 813.130(1), and subsection (4) of the statute makes clear that DMV can provide "additional information concerning rights and consequences that the department considers convenient or appropriate." The ICCR form, prepared by DMV in accordance with administrative procedure, sets forth the rights and consequences to be read to drivers. It is those rights and consequences that serve to "coerce submission to a breath test" by "nonforcibly enforc[ing] the driver's previous implied consent." *State v. Kirsch*, 215 Or App 67, 73, 168 P3d 318 (2007). That form makes no mention of obtaining a warrant—consistent with ORS 813.130, which likewise makes no mention of a warrant being among the possible consequences related to administration or refusal of the test.

In this case, the trooper's statements "I'm going to read to you and I will go straight on to write a search warrant then. That's what we do in this county. We write search warrants if you are going to refuse" added an additional consequence—beyond those contained in the approved ICCR—to "coerce" the driver in this case. The fact that the trooper was legally authorized to obtain a warrant as part of his criminal investigation is not determinative of whether he followed the administrative procedures for the DMV suspension. The administrative scheme at issue vests the authority, not with individual officers, but solely with

the DMV, which defines the rights and consequences read to drivers. Accordingly, the trooper's modification of those rights and consequences was a "legally unauthorized procedure" and, as such, the administrative sanction levied based on those invalid procedures is itself invalid.

Affirmed.